# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
### Case No: 1:25-cv-348-MR-WCM

| | |
|---|---|
| TRAVIS BLANTON and HANNAH BLANTON., </br></br>  Plaintiffs, </br></br> v. </br></br> AUTO-OWNERS INSURANCE COMPANY </br></br>  Defendant. | **COMPLAINT** |

Plaintiffs Hannah Blanton and Travis Blanton ("Blantons" or "Plaintiffs"), for their Complaint against Defendant Auto-Owners Insurance, allege as follows:

## Parties, Jurisdiction, and Venue

1. The Blantons are citizens and residents of Spruce Pine, Mitchell County, North Carolina and are the owners of property located at 68 Galax Trail, Spruce Pine, NC 28777 ("the Blanton Home").

2. Auto-Owners is an insurance company domiciled in the State of Michigan with its principal place of business in Lansing, Michigan. Auto-Owners is authorized to sell various types of insurance, including property insurance, in the State of North Carolina.

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship and the amount in controversy in this matter exceeds $75,000, exclusive of interest and costs. Auto-Owners has consented to this Court's jurisdiction

and agrees that it is amenable to suit in North Carolina pursuant to the express terms of N.C.G.S. § 55-15-07.

4. At all relevant times, Auto-Owners did business in and availed itself of the laws of the State of North Carolina, by regularly transacting business in North Carolina and issuing numerous and various policies of insurance to North Carolina residents, including issuance of the subject insurance policy to the Blantons in North Carolina.

5. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the Blantons' claims occurred in this District.

**Factual Allegations**

6. At all times relevant hereto, Plaintiffs were the named insureds under Auto-Owners "All Perils" Policy #5293688200, which provided coverage to Plaintiffs and the Blanton Home for losses resulting from various circumstances set forth in the policy, for the policy period from August 17, 2024 through August 17, 2025 ("the Policy"). A true and accurate copy of the Policy, including all riders and endorsements, is attached to the Complaint as Exhibit "A" and incorporated as if set forth verbatim herein.

7. On September 27, 2024, the Blanton Home was covered under the Policy, which included Coverages for Dwelling (Coverage A) at full Replacement Cost, Personal Property (Coverage C) at full Replacement Cost, and Loss of Use and Additional Living Expenses (Coverage D), along with a 25% Specified Additional Insurance Endorsement.

8. Hurricane Helene's inland journey on September 27, 2024 was truly unprecedented, both in the sustained ferocity of the storm and in its catastrophic impact on the communities and residents of Western North Carolina, including the Blantons.

9. Hannah and Travis Blanton and their children (O.B. and V.B., then ages 9 and 5) lost everything in the storm. On the morning of the hurricane, the family was standing in the kitchen when a wind-blown tree smashed through their roof and into their home, just a few feet away from where they were standing, causing catastrophic structural damage and allowing wind and wind-blown rain to immediately enter the house. Other downed trees blocked the road, and they spent the next several hours huddling together in the home, with no power, no water, and no way out. When the main storm passed, neighbors managed to clear the road. The Blantons were only able to pack a few items of clothing for each of them, leaving all of their other possessions behind. They managed to find a room that night at a motel, and paid cash since there was no way for anyone to process credit card payments in the entire region for more than a week.

10. The Blantons, relying on the promises of coverage contained in the Policy, reported the claim to Auto-Owners shortly as soon as possible given the widespread power and cellular outages. Auto-Owners accepted the claim report and opened Claim Number 300-0633404-2024.

11. The Blantons were not able to return to their home for the next six days due to the widespread damage from the storm. When they were able to do so, they found a completely water-soaked structure including the entire main floor, and several inches of standing water in the basement. While they were initially hopeful that some of their possessions would be recoverable, they simply were not, due to damage from the storm. In short, the Blantons lost everything other than what they were able to pack in a few small bags on the evening of the hurricane.

12. Thousands of Western North Carolina residents were, like the Blantons, left homeless by the storm, and due to the extensive and widespread damage, alternative housing in the area quickly became unavailable or unaffordable. The Blantons and their children therefore had no choice but to live an itinerant life with family members and friends, doing their best to

move forward with work and the childrens' school. Finally, two months after the storm, a local church donated a small camper, in which the Blantons are still living. While a small camper was in no sense a replacement for their home, it was and is all that is available to them until they can rebuild their home. Although they have attempted to locate alternative living arrangements that provide access to their childrens' school and Hannah's job, the Blantons continue to live in the camper, more than a year after the storm, as a result of the conduct of Auto-Owners as set forth below, and have incurred significant additional living expenses as a result.

13. As a result of the tree crashing into the Blanton Home on September 27, 2025, which destroyed and damaged the foundation, walls, and roof and exposed the home to the elements, the Blanton Home has been uninhabitable and unrepairable since that date and remains uninhabitable and unrepairable.

14. No representative of Auto-Owners visited or inspected the Blanton Home until October 21, 2024 – nearly a month after the hurricane. On that date, independent adjuster Christian Todd visited the home on behalf of Auto-Owners, took numerous photographs, and submitted a status report to Auto-Owners. These photographs and Mr. Todd's report have been requested from Auto-Owners on numerous occasions, but Auto-Owners has refused to provide them to the Blantons. Mr. Todd has refused to contact the Blantons or their representatives. On information and belief, however, Mr. Todd did not conduct a thorough structural review or analysis of the Blanton Home's foundation, nor did he conduct a thorough evaluation of the extensive storm-driven weather damage in the Blanton Home.

15. On November 13, 2024, at the request of Auto-Owners, the Blantons prepared and submitted a sworn proof of loss statement and a 23-page detailed list of personal property losses, totaling $60,296.73. Although the Blantons had not been provided with any information from

4

Mr. Todd's inspection and are not construction professionals, they also estimated the cost of replacing the Blanton Home at $337,877 and provided this to Auto-Owners as part of the sworn proof of loss.

16. Notwithstanding the sworn proof of loss and its obligations under the Policy, on December 16, 2024 – nearly three months after the hurricane and two months after the inspection by Mr. Todd - Auto-Owners sent the Blantons a "repair estimate" in the amount of $178,597.94. Although knowing that this was far less than the actual cost to repair the Blanton Home and also knowing that the Policy required payment for replacement cost in the event of a catastrophic loss, Auto-Owners improperly included depreciation in the estimate, claiming that the "actual cash value" loss to the Blantons under the policy was only $148,015.86. Auto-Owners send a check to the Blantons for even less than this amount - $142,710.09.

17. The attempt to resolve the Blantons' claim for less than half of the Blantons' covered losses and the attempt to deduct depreciation with knowledge that the Blantons' losses were well over 80% of the applicable policy limits were violations of the policy language and Auto-Owners duties to the Blantons.

18. The Blantons did not negotiate the $142,710.09 check sent by Auto-Owners. Instead, the Blantons utilized their own resources to obtain a thorough and professional estimate of the damage to the Blanton Home and the cost of rebuilding. On January 14, 2025, a more thorough and extensive analysis of the damage to the Blantons' home was done by Austin McKinney, a construction and estimating professional at Mineral City Carpentry, Inc., who was at that point intimately familiar with the costs of materials and construction then prevalent in Western North Carolina. Following his inspection and evaluation, Mr. McKinney concluded that "the damage is so extensive and pervasive that repair would not be feasible or cost effective." Mr.

McKinney also concluded that "a complete demolition of the structure and subsequent rebuild is the only viable solution." Finally, Mr. McKinney concluded that the estimated cost for demolition, site preparation, and full rebuild was $660,000. A copy of Mr. McKinney's report was provided to Auto-Owners immediately, and it is attached as **Exhibit B** and incorporated is if set forth in full in this paragraph**.**

19. On January 22, 2025, Dillon Phillips, the Mitchell County Director of Building Inspections (the governing body for the Blantons' home) also inspected the home. Mr. Phillips reinforced Mr. McKinney's conclusions, stating in a letter dated January 23, 2025, that due to the damage from the hurricane-blown tree, "the house is unrepairable." A copy of this letter was provided to Auto-Owners immediately, and it is attached as **Exhibit C** and incorporated as if set forth in full in this paragraph.

20. Despite the additional information received from Mr. McKinney and Mr. Phillips, Auto-Owners did not prepare or issue any new or updated cost estimate or offer to pay the Blantons the amounts owed under the Policy.

21. On February 14, 2025, Auto-Owners retained Curtis Ensley, a structural engineer, to inspect portions of the Blanton Home – specifically to evaluate the roof structure and exterior walls of the Blanton Home. Mr. Ensley was not retained to, and did not, inspect the interior of the home. Mr. Ensley did not inspect the foundation of the Blanton Home.

22. More than a month after his inspection, Mr. Ensley submitted a "report of findings" to Auto-Owners. Mr. Ensley's report was sloppy, incomplete, and inaccurate, and did not purport to address the overall damage to the Blanton Home or the cost of repairing all of the damage to the Blanton Home caused by the hurricane.

6
Case 1:25-cv-00348-MR-WCM    Document 1    Filed 10/09/25    Page 6 of 12

23. Auto-Owners did not prepare or issue a new or updated cost estimate based on the findings from Mr. Ensley's report.

24. Utilizing their own resources for the second time, the Blantons retained another independent construction expert, to evaluate the damage to the Blanton Home. On April 5, 2025, the home was thoroughly inspected by Luke Howell, a local licensed General Contractor. Mr. Howell prepared a report on April 13, 2025 along with a preliminary cost estimate. Mr. Howell also concluded – like Messrs. McKinney and Phillips – that the house was unrepairable and needed to be demolished and rebuilt. Mr. Howell estimated the cost of demolition at **$64,000** and the cost of rebuilding at **$336,074**. Mr. Howell's reports were provided to Auto-Owners immediately, and they are attached as **Exhibits D** and **E** and incorporated as if set forth in full in this paragraph.

25. Auto-Owners failed to respond to the Blantons' numerous requests for an updated damage estimate and for payment of the full amount due to the Blantons for the damage to their home and personal property. The Blantons, still living in a small trailer more than six months after the hurricane, were left with no choice but to retain counsel in April 2025, simply to obtain the amounts due under the policy.

26. On May 9, 2025, the Blantons, via counsel, made a written demand to Auto-Owners for payment of the policy limits on Coverage A of $366,187.50 (which included the additional coverage amounts for debris cleanup). The Blantons also demanded payment of the full replacement cost of their property covered under Coverage C of the Policy ($60,296.73), and the payment of a fraction of their additional living expenses ($32,521.60) covered under Coverage D of the Policy. Auto-Owners acknowledged receipt of this demand, but has never, to date, responded to the demand with any payment, offer, or indication that Auto-Owners would pay the amounts owed to the Blantons under the policy.

27. On May 20, 2025, a representative of Auto-Owners contacted Mr. Phillips, the Mitchell County Building Inspector who had concluded in January 2025 that the Blanton Home could not be repaired due to damage from the hurricane. Neither the Blantons nor their representatives were part of this discussion. One week later, on May 28, Mr. Phillips prepared a new letter, this time including the word "mold".

28. On June 9, 2025, Auto-Owners advised the Blantons that due to "mold", Auto-Owners would now only pay $5,000 for any part of the Blanton Home that was "full of mold." Auto-Owners also claimed, for the first time, that some or all of the Blantons' covered losses might be limited by other provisions of the Policy including the "Ordinance or Law" policy provision.

29. Between June 9, 2025 and August 18, 2025, the Blantons attempted to communicate with Auto-Owners regarding their covered losses, their demand, Auto-Owners' position on coverage, and the Blantons' covered losses. On multiple occasions, the Blantons requested:

   a. Confirmation of the applicable Policy limits;

   b. Auto-Owners' coverage position with respect to Coverages A, C, and D under the Policy, and the applicable Policy provision or provisions on which Auto-Owners was relying for its position;

   c. Photographs, documents, and other evidence as well as any ordinance or law on which Auto-Owners was relying to support its position on coverage as to Coverages A, C, and D, specifically including the factual and legal basis for Auto-Owners' June 9 references to mold and the Ordinance or Law policy provision;

   d. The photographs taken by adjuster Christian Todd when he inspected the Blanton Home on October 21, 2024;

e. The report that adjuster Christian Todd prepared and sent to Auto-Owners on October 22, 2024.

30. Auto-Owners refused to provide the photographs, reports, and legal and factual information requested by the Blantons.

31. Auto-Owners has not responded to the Blantons' requests for information and an explanation of Auto-Owners' position on coverage.

32. On August 18, 2025, Auto-Owners provided the Blantons with an updated repair estimate for the Blanton Home, in the total amount of $473,345.97.

33. Since August 18, 2025, and despite further requests by the Blantons, Auto-Owners has not provided or explained its position on coverage, provided the Blantons with any factual or other information, or responded in any way to the Blantons' May 19 demand. The Blantons have therefore been left with no choice but to file this suit.

**First Claim for Relief**
**(Breach of Contract)**

34. Plaintiffs incorporate the allegations contained in paragraphs 1 through 33 above, as though fully set forth in this paragraph.

35. The Policy is a valid and enforceable contract between Plaintiffs and Auto-Owners.

36. Plaintiffs paid premiums to Auto-Owners in exchange for insurance coverage promised by Auto-Owners in the policy, and fulfilled all other obligations and conditions precedent to Auto-Owners payment under the Policy that were provided in the Policy and under North Carolina law.

37. Auto-Owners materially breached the Policy by failing and refusing, despite demand, to provide the coverage and payments promised in the Policy.

38. As a direct and proximate result of Auto-Owners material breaches of the policy, Plaintiffs have been damaged in at least the amount of $566,164.30 (less partial payments made by Auto-Owners in the amount of $28,538.34), which damages continue to accrue.

### Second Claim For Relief
### (Violations of N.C. Gen. Stat. §§ 58-63-15(11) and 75-1.1)

39. The North Carolina Unfair Claims Settlement Practices Act, codified at N.C. Gen. Stat. § 5863-15(11), outlaws certain specified conduct by insurers and their agents in relation to the investigation, adjustment and payment of claims for insurance coverage. Each separate violation of the Unfair Claims Settlement Practices Act constitutes a *per se* violation of the North Carolina Unfair and Deceptive Trade Practices Act, codified at N.C. Gen. Stat. § 75-1.1 *et seq.*; *Gray v. North Carolina Ins. Underwriting Ass'n*, 352 N.C. 61, 529 S.E.2d 676, 683 (2000).

40. Defendants' conduct as described above violated numerous provisions contained in N.C. Gen. Stat. §§ 58-63-15(11), and thus violated the North Carolina Unfair and Deceptive Trade Practices Act in a number of ways, including the following:

   a. Auto-Owners misrepresented pertinent facts or insurance policy provisions relating to coverages at issue under the Policy;

   b. Auto-Owners failed to acknowledge and act reasonably promptly upon communications with respect to the Plaintiffs' claims arising under the Policy;

   c. Auto-Owners refused to pay the Plaintiffs' claims without conducting a reasonable investigation based upon all available information;

   d. Auto-Owners refused to either affirm or deny coverage of claims within a reasonable time after proof-of-loss statements were completed by Plaintiffs;

e. Auto-Owners refused, in bad faith, to effectuate prompt, fair, and equitable settlement of the Plaintiffs' claims, despite demand and despite the fact that Auto-Owners liability under the Policy was reasonably clear.

f. Auto-Owners failed and refused to provide a reasonable explanation of the basis for its refusal to settle the Plaintiffs' claims, denial of Plaintiffs' claims, or under the Policy in relation to the facts or applicable

g. Auto-Owners, by its conduct, compelled the Blantons to institute litigation to recover amounts owed under the policy by offering substantially less than the amount to which Plaintiffs were entitled;

h. Auto-Owners attempted to settle plaintiffs claims for less than the amount which a reasonable person would have believed they were entitled;

i. Auto-Owners delayed the investigation or payment of Plaintiffs claims by requiring Plaintiffs to submit substantially the same information numerous time.

j. Auto-Owners failed to promptly settle Plaintiffs' claims where liability ahd become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the Policy;

41. Pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1, Plaintiffs are entitled to recover a mandatory award of treble damages and a discretionary award of attorneys' fees.

## Jury Demand

42. Plaintiffs demand trial by jury on all claims so triable.

WHEREFORE, Plaintiffs request the Court to:

1. Enter judgment in their favor on their First Claim for Relief, awarding Plaintiffs all actual and consequential damages in amounts to be proven at trial, plus costs of suit and prejudgment interest calculated at the statutory rate of eight percent per annum;

2. Enter judgment in their favor on the Second Claim for Relief, awarding Plaintiffs three times their actual and consequential damages, their reasonable attorney fees, costs of suit, and prejudgment interest calculated at the statutory rate of eight percent per annum;

3. Award Plaintiffs all further and additional relief to which they are entitled.

Dated: October 9, 2025

Respectfully submitted,

By:     /s/ Darin J. Lang
Darin J. Lang (NC Bar No. 59197)
BUSH SEYFERTH PLLC
81 Broadway Street, Suite 201-026
Asheville, NC 28801
 -and-
100 West Big Beaver Road, Suite 400
Troy, Michigan 48084
(248) 822-7800
lang@bsplaw.com